# FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE___NOV 1 4 2013

~~Ma dsen C.Q.~~

~~CHIEF JUSTICE~~

This opinion was filed for record
at _8:00 a.m._ on __Nov 14, 2013__

_for_ Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STEVE and KAREN DONATELLI, a married couple, | ) ) ) | |
| Respondents, | ) ) | No. 86590-6 |
| v. | ) ) | EN BANC |
| D.R. STRONG CONSULTING ENGINEERS, INC., a Washington corporation, | ) ) ) ) ) | Filed: ___NOV 1 4 2013___ |
| Petitioner. | ) ) ) | |

FAIRHURST, J.—Steve and Karen Donatelli hired D.R. Strong Consulting Engineers Inc. to help the Donatellis develop their real property. Before development of the property could be completed, however, the Donatellis suffered substantial financial losses and lost the property in foreclosure. The Donatellis sued D.R. Strong for breach of contract, violation of the Consumer Protection Act (CPA), chapter 19.86 RCW, negligence, and negligent misrepresentation. D.R. Strong moved for partial summary judgment on the CPA and negligence claims.

D.R. Strong argued that the negligence claims must be dismissed under the economic loss rule because the relationship between the parties was governed by contract and the damages claimed by the Donatellis were purely economic. The trial court and Court of Appeals held that as a matter of law, the Donatellis' negligence claims were not barred. We affirm.

## I.    FACTUAL AND PROCEDURAL HISTORY

The Donatellis consulted with and hired D.R. Strong to help the Donatellis develop their King County real property into two short plats. According to Steve Donatelli, D.R. Strong's representatives orally agreed to help the Donatellis with the county permitting process and to manage the project "through to [the] final recording of the short plats." Clerk's Papers (CP) at 65.  In their complaint, the Donatellis alleged that D.R. Strong agreed to:

> a. Perform the necessary surveys and analyses;
> b. Create the required plans for, *inter alia*, soil erosion, storm water drainage;
> c. Prepare the necessary reports and County permit applications; and
> d. Take all other actions necessary to get the short plats recorded with King County so that Donatelli could build houses on each lot.

CP at 2. According to the Donatellis, D.R. Strong represented that it would be able to finish the project within "approximately one and [one-half] years, if not less time." CP at 4.

D.R. Strong's first involvement in the project was apparently helping the Donatellis apply for preliminary approval for the project with King County

pursuant to King County Code 19A.08.150. King County granted preliminary approval on October 4, 2002. In its letter granting preliminary approval, the county noted that the "preliminary approval is valid for a period of 60 months." CP at 28.

On October 11, 2002, D.R. Strong sent the Donatellis a written contract for engineering services entitled "Revised Proposal for Engineering Services." CP at 21. In the contract, D.R. Strong agreed to perform six phases of engineering services in exchange for an estimated fee totaling $33,150. The contract did not reflect whether D.R. Strong agreed to provide managerial services or to oversee the day-to-day operation of the project. The contract limited D.R. Strong's professional liability to $2,500 or its professional fee, whichever was greater. Steve Donatelli apparently signed the contract on October 31, 2002, although he now claims that he did not know what he was signing.

According to the Donatellis, between October 2002 and October 2007, D.R. Strong assumed a managerial role over the project and worked closely with other contractors, builders, and vendors involved with the project. *See* CP at 67 (D.R. Strong "ran the daily operations of the Project."); *id.* at 68 (D.R. Strong "[was] running the show."). Although in the written contract D.R. Strong estimated its fee would be $33,150, D.R. Strong allegedly charged the Donatellis "approximately $120,000 in costs and fees" over the course of the project. CP at 2.

In October 2007, the preliminary approval expired and the project was still not complete. The expiration of the preliminary approval came as a complete surprise to the Donatellis. According to Steve Donatelli, employees of D.R. Strong "apologized many times, said that they screwed up, and that they would make everything right." CP at 67. D.R. Strong began the process of obtaining a new preliminary approval for the project. Before D.R. Strong could obtain a new preliminary approval, however, the Donatellis suffered substantial financial losses and eventually lost the property in foreclosure.

The Donatellis sued D.R. Strong, claiming damages in excess of $1.5 million and alleging breach of contract, CPA violations, negligence, and negligent misrepresentation. D.R. Strong moved for partial summary judgment on the CPA, negligence, and negligent misrepresentation claims. D.R. Strong argued that the economic loss rule barred the Donatellis' negligence claims. The trial court denied summary judgment on the two negligence claims but granted summary judgment on the CPA claims. The trial court found that "professional negligence claims can be stated even in the context of a contractual relationship." CP at 95.

The Court of Appeals affirmed, holding that the independent duty doctrine did not bar the Donatellis from bringing negligence claims against D.R. Strong because professional engineers owe duties to their client independent of any contractual relationship. *Donatelli v. D.R. Strong Consulting Eng'rs, Inc.*, 163

4

Wn. App. 436, 443, 261 P.3d 664 (2011). We granted D.R. Strong's petition for review. *Donatelli v. D.R. Strong Consulting Eng'rs, Inc.*, 173 Wn.2d 1025, 272 P.3d 851 (2012).

## II.  ISSUES

A.  Did the trial court properly deny summary judgment as to the Donatellis' negligence claim when there were genuine issues of material fact regarding the scope of D.R. Strong's contractual obligations to the Donatellis?

B.  Did the trial court properly deny summary judgment as to the Donatellis' negligent misrepresentation claim when the Donatellis alleged D.R. Strong misrepresented the time and expense necessary to complete the project and such representations induced the Donatellis to contract with D.R. Strong?

## III.  STANDARD OF REVIEW

Typically, we review an order on summary judgment de novo, engaging in the same inquiry as the trial court. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  CR 56(c).  In this case, the trial court did not consider whether there were genuine issues of material fact underlying D.R. Strong's motion for summary judgment because the motion presented a purely legal question—does the economic loss rule bar the Donatellis from bringing claims of negligence and negligent misrepresentation against D.R. Strong? We review alleged errors of law de novo. *Jongeward v. BNSF Ry.*, 174 Wn.2d 586, 592, 278 P.3d 157 (2012) (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001)).  To the

extent we consider factual issues in this case, we consider all facts and reasonable inferences in the light most favorable to the Donatellis, the nonmoving party. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

## IV. ANALYSIS

The question D.R. Strong presented before the trial court and the Court of Appeals was whether the economic loss rule barred the Donatellis' negligence and negligent misrepresentation claims against D.R. Strong. Both the trial court and the Court of Appeals found, as a matter of law, that the Donatellis' negligence claims should not be dismissed. We agree.

Regarding the Donatellis' negligence claim, it is unclear from the record what professional obligations D.R. Strong assumed toward the Donatellis based on oral representations, the written contract, and D.R. Strong's affirmative conduct. Regarding the Donatellis' negligent misrepresentation claim, we find the duty to avoid misrepresentations that induce a party to enter into a contract arise independently of the contract. Because D.R. Strong's duty to avoid negligent misrepresentation arose independently of the contract, the independent duty doctrine does not bar the Donatellis' negligent misrepresentation claim.

A.    Negligence

The Court of Appeals found that the independent duty doctrine did not bar the Donatellis' claim for negligence. We agree but find that the independent duty doctrine cannot apply to this case because the record does not establish the scope of D.R. Strong and the Donatellis' contractual duties.

Historically, Washington applied the economic loss rule to bar a plaintiff from recovering tort damages when the defendant's duty to the plaintiff was governed by contract and the plaintiff suffered only economic damages. *Alejandre v. Bull*, 159 Wn.2d 674, 683, 153 P.3d 864 (2007). The economic loss rule "attempted to describe the dividing line between the law of torts and the law of contracts." *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 385, 241 P.3d 1256 (2010).

In *Eastwood*, a majority of this court concluded that the term "economic loss rule" was a misnomer and renamed the rule the "independent duty doctrine" to more accurately describe how this court determines whether one contracting party can seek tort remedies against another party to the contract. The independent duty doctrine continues to "'maintain the boundary between torts and contract'" in the place of the economic loss rule. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 165, 273 P.3d 965 (2012) (quoting *Eastwood*, 170 Wn.2d at 416 (Chambers, J., concurring)). The court has limited the application of the independent duty

7

doctrine to a "narrow class of cases . . . claims arising out of construction on real property and real property sales." *Elcon*, 174 Wn.2d at 165.

Under the independent duty doctrine, "[a]n injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Eastwood*, 170 Wn.2d at 389. The analytical framework provided by the independent duty doctrine is only applicable when the terms of the contract are established by the record. To determine whether a duty arises *independently* of the contract, we must first know what duties have been assumed by the parties *within* the contract. If a contract term (such as a term defining the scope of the parties' contractual duties) is ambiguous, the trial court must ascertain the intent of the parties. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). "Contract interpretation is normally a question of fact for the fact-finder." *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 654, 266 P.3d 229 (2011).

This case makes obvious the inability of the independent duty doctrine to provide an analytical framework when the scope of contractual duties are in dispute. Generally, "the foundation of any liability analysis for . . . design professional[s] rests in contract." ARCHITECT AND ENGINEER LIABILITY: CLAIMS AGAINST DESIGN PROFESSIONALS § 1.05, at 7 (Kevin R. Sido ed., 3d ed. 2006). In a contract, design professionals and their clients can allocate risks and ensure against

8

"expected liability exposure." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826-27, 881 P.2d 986 (1994).

But design professionals also owe duties to their clients and the public to act with reasonable care, which can sometimes give rise to a tort duty independent of the contract. *See Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 461, 243 P.3d 521 (2010) (Engineers have an independent duty to "use reasonable care . . . with respect to risks of physical damages to [physical property]."); *Jarrard v. Seifert*, 22 Wn. App. 476, 479, 591 P.2d 809 (1979) (engineers undertaking engineering services in this state have a common law duty of reasonable care); Murray H. Wright & Edward E. Nicholas, III, *The Collision of Tort and Contract in the Construction Industry*, 21 U. RICH. L. REV. 457, 464 (1986-87) ("[D]esign professionals owe a tort duty to the general public to take reasonable care to avoid causing foreseeable personal injuries or property damage." (citing RESTATEMENT (SECOND) OF TORTS § 324A (1965))).

Regardless of whether a client's claim is framed as a breach of contract or a tort claim, however, "the first step in analyzing a professional malpractice claim is to determine the scope of the professional obligations." ARCHITECT AND ENGINEER LIABILITY, *supra*, § 501[E], at 94. The scope of engineers' professional obligations should be set forth in written contracts between engineers and their clients. *See id.* (recommending that contracts between design professionals and their clients

contain detailed descriptions of the scope of the professionals' services). A contract may assume an engineer's common law duty to act with reasonable care. *See Seattle W. Indus., Inc. v. David A. Mowat Co.*, 110 Wn.2d 1, 10, 750 P.2d 245 (1988) ("The scope of an engineer's common law duty of care extends at least as far as the duties assumed by him in the contract with the owner."). Engineers may also assume additional professional obligations by their "affirmative conduct." *Id.*

In this case, the record does not establish the scope of D.R. Strong's professional obligations to the Donatellis. The Donatellis allege that D.R. Strong orally promised to manage the short plat project and oversee the work of other subcontractors involved with the project.[1] The Donatellis also allege that D.R. Strong promised to take care of the necessary paperwork and permitting processes. D.R. Strong, however, seems to argue that it only agreed to provide the six phases of engineering services outlined in the written contract.[2]

It is also unclear whether D.R. Strong assumed additional duties to the Donatellis by virtue of its affirmative conduct. From the affidavits provided by the

---

[1]"The interpretation of an oral contract is generally not appropriate for summary judgment because the existence of an oral contract and its terms usually depends on the credibility of witnesses testifying to specific fact-based dealings which, if believed, would establish a contract and the contract's terms." *Spradlin Rock Prods.*, 164 Wn. App. at 655.

[2]Conspicuously absent from the written contract is any type of merger or integration clause providing that the written contract supersedes any prior agreements between the parties. Such a clause would tend to diminish the likelihood of the Donatellis establishing the existence of an oral contract. *See* ARCHITECT AND ENGINEER LIABILITY, *supra*, at 8 ("A written agreement with a 'merger clause' or an 'integration clause' can prevent the opposite side from attempting to explain or embellish contractual terms.").

Donatellis, it appears that at least two contractors involved with the project agree that D.R. Strong oversaw work performed by at least some subcontractors. According to the Donatellis' general contractor, D.R. Strong would "advise and direct [the contractor's] efforts in fixing day-to-day problems." CP at 84. Another subcontractor hired by the Donatellis stated that D.R. Strong "coordinated the different parts of the job." CP at 80. The written contract, however, does not appear to require D.R. Strong to provide such services. Furthermore, the significant discrepancy between D.R. Strong's estimated fee, and the fee it allegedly charged the Donatellis, might be evidence that D.R. Strong performed additional work not contemplated by the written agreement.

Given that the record does not reflect what the Donatellis and D.R. Strong agreed to, and what duties D.R. Strong assumed through its affirmative conduct, it is impossible to say at this point what professional obligations D.R. Strong owed to the Donatellis—contractually or otherwise. The trial court properly denied D.R. Strong's motion for summary judgment on the Donatellis' negligence claim. Because we do not know the scope of D.R. Strong's contractual obligations, we cannot determine if any of D.R. Strong's duties to the Donatellis arose independently of the contract. We affirm the Court of Appeals.

B.    Negligent misrepresentation

The trial court and the Court of Appeals found that the independent duty doctrine did not bar the Donatellis' claim for negligent misrepresentation. We agree because the duty to avoid misrepresentations that induce a party to enter into a contract arises independently of the contract.

Generally, Washington recognizes a tort claim for negligent misrepresentation based on the *Restatement (Second) of Torts* § 522(1) (1977).[3] *Van Dinter v. Orr*, 157 Wn.2d 329, 332-33, 138 P.3d 608 (2006); 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 18.10 (3d ed. Supp. 2012). The former economic loss rule often barred a plaintiff from bringing a negligent misrepresentation claim against a defendant who had contracted with the plaintiff against potential economic liability. *See, e.g., Berschauer/Phillips*, 124 Wn.2d at 828 (general contractor barred from asserting negligent misrepresentation claim against design professionals); *Alejandre*, 159 Wn.2d at 677 (buyers of home barred from asserting negligent misrepresentation

---

[3]    A plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007) (citing *Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002)).

12

claim against seller); *Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 211-13, 969 P.2d 486 (1998) (homeowners barred from asserting negligent misrepresentation claim against builder-vendor).

But since adopting the independent duty doctrine, the court has emphasized that in some circumstances, a negligent misrepresentation claim may be viable even when only economic damages are at stake and the parties contracted against potential economic liability. In *Jackowski v. Borchelt*, 174 Wn.2d 720, 738, 278 P.3d 1100 (2012), we noted that, like a claim for fraud, a negligent misrepresentation claim might exist "to the extent the duty to not commit negligent misrepresentation is independent of the contract."[4] This rule is narrower than the rule adopted in some jurisdictions where the duty to avoid negligent misrepresentation always arises independently of the contract. *See, e.g., Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 582 (Ky. 2004) ("by adopting [RESTATEMENT] § 522, we agree that the tort of negligent misrepresentation defines an independent duty for which recovery in tort for economic loss is available"). In essence, the rule expressed in *Jackowski*

---

[4]Since *Jackowski*, the Court of Appeals has correctly applied the independent duty doctrine to conclude that a trial court should not "automatically dismiss" a plaintiff's negligent misrepresentation claim "based solely on the existence of a contract between [the parties]." *Key Dev. Inv., LLC v. Port of Tacoma*, 173 Wn. App. 1, 24, 292 P.3d 833 (2013) (holding that the independent duty doctrine did not bar a property owner's negligent misrepresentation claim against a potential buyer of property when the trial court made no findings regarding whether the buyer's alleged duties arose independently of the contract).

13

recognizes that there are some circumstances where the duty to avoid negligent misrepresentation might arise independently of the contract.

One circumstance where the duty to avoid negligent misrepresentation might arise independently of the contract is where one party, through misrepresentations, induces another to enter into a contractual relationship. *See, e.g., Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 163-64, 744 P.2d 1032, 750 P.2d 254 (1987) (trial court erred in dismissing bondholders' negligent misrepresentation claim against design engineers when the engineers' statements induced the bondholders to purchase bonds issued to finance construction of nuclear power plant); *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991) ("a contracting party's negligent misrepresentation of material facts prior to the execution of an agreement may provide the basis for an independent tort claim asserted by a party detrimentally relying on such negligent misrepresentations"); *Gilliland v. Elmwood Props.*, 301 S.C. 295, 301, 391 S.E.2d 577 (1990) (recognizing owner's negligent misrepresentation claim against architect when architect's misrepresentations induced the owner to enter a contract).

That is not to say that the duty to avoid negligent misrepresentation cannot be assumed in a contract. For example, a real estate contract may be written to assume the seller's duty to avoid misrepresentations to the buyer, thus precluding

14

the buyer from later bringing a negligent misrepresentation claim against the seller. *See, e.g., Alejandre*, 159 Wn.2d at 679 (buyer's negligent misrepresentation claim against seller barred when seller disclosed all known defects and buyers acknowledged their own duty to "'pay diligent attention to any material defects'" when such defects could be discovered through "'diligent attention and observation'" (quoting Ex. 5)); *Snyder v. Lovercheck*, 992 P.2d 1079, 1083 (Wyo. 1999) (purchaser's negligent misrepresentation claim against seller barred when purchase agreement contained an "''as is' clause, a merger clause, a liberal inspection clause, . . . a specific objection procedure," and provided, "'Purchaser is not relying upon any representations of the Seller'" (quoting contract)).

In this case, the trial court properly denied summary judgment on the Donatellis' negligent misrepresentation claim because D.R. Strong's duty to avoid misrepresentations that induced the Donatellis to enter into a contract arose independent of the contract. Specifically, the Donatellis allege that D.R. Strong "originally represented to [them] that the Project should be able to be completed within approximately one and 1/2 years, if not less time . . . and that the Project should not take more than $50,000 to complete." CP at 2. Based on these representations, the Donatellis "retain[ed] [D.R. Strong] to handle the Project." *Id.* We make no ruling on whether the Donatellis will eventually prevail on their negligent misrepresentation claim. We hold only that D.R. Strong's duty to avoid

15

negligent misrepresentations that induced the Donatellis into hiring D.R. Strong arose independently of the contract. The independent duty doctrine does not bar the Donatellis from asserting their negligent misrepresentation claim. We affirm the Court of Appeals.

## V. CONCLUSION

The independent duty doctrine is an analytical framework that is used to determine whether one party to a contract can bring tort claims against another party to the contract. The independent duty doctrine will allow a plaintiff to pursue tort claims against a defendant when the plaintiff can prove defendant's "breach of a tort duty arising independently of the terms of the contract." *Eastwood*, 170 Wn.2d at 389. To determine whether a duty arises independently of the contract, we must first know what duties have been assumed by the parties within the contract.

Because there are genuine issues of material fact regarding the scope of D.R. Strong's contractual duties to the Donatellis, we cannot apply the independent duty doctrine to say, one way or the other, whether D.R. Strong had a duty independent of the contract to avoid professional negligence. However, D.R. Strong's duty to avoid misrepresentations that induced the Donatellis to contract with D.R. Strong in the first place *do* arise independent of any contract the parties might have agreed to. The Donatellis' negligence claims cannot simply be dismissed on the narrow

16

legal grounds argued by D.R. Strong. We affirm the trial court and Court of Appeals and remand for further proceedings consistent with this opinion.

Fairhurst, J.

WE CONCUR:

No. 86590-6

MADSEN, C.J. (dissenting in part)—Partial summary judgment in favor of defendant D.R. Strong Consulting Engineers Inc. should have been granted on both of Steven and Karen Donatellis' negligence claims. There are several grounds on which the court could reach this conclusion as a matter of law. Instead, the majority comes up with a factual issue not raised or addressed by either party, worrying that the written contract may not set out all of D.R. Strong's professional services and other services may have arisen from oral agreements or have been assumed by D.R. Strong. The majority decides that until a determination of the scope of professional services is made, it is impossible to decide whether the "independent duty doctrine" applies to the Donatellis' negligence claims.

The factual inquiry called for by the majority is unnecessary because it is not material to the "independent duty doctrine" that the majority seeks to apply. It will also unduly delay resolution of this litigation.

In addition, the independent duty doctrine that the majority seeks to apply cannot be harmonized with the parties' written agreement or with settled principles of contract law.

The court should decide this case on one of several legitimate grounds that justify partial summary judgment in favor of D.R. Strong on the negligence and negligent misrepresentation causes of action. First, this case is in all relevant respects indistinguishable from *Berschauer/Phillips Construction Co. v. Seattle School District No. 1*, 124 Wn.2d 816, 881 P.2d 986 (1994), which has not been overruled and which the court should conclude is controlling precedent.

Second, when the parties' relationship is governed by a professional engineering services contract, the questions that should be answered are (a) whether the parties' contract encompasses the risk of harm that is claimed, i.e., is the harm or injury the kind that results when the contractual promises are not performed in accord with the parties' contractual expectation interests and (b) does the contract govern the remedies when breach occurs? Here, the plaintiffs' claims are founded on breach of contract and the remedies, if any, should be limited to contractual remedies. The Donatellis do not assert property damage or personal injury, the kind of harm that should be remedied outside the contractual arrangement.

These first two grounds are within the scope of the issue raised by D.R. Strong when it sought discretionary review of the trial court's denial of summary judgment on its negligence and negligent misrepresentation claims.

Third, and regardless of any other analysis, the plaintiffs' tort claims are precluded by the limitation of professional liability in the parties' contract. The professional liability limitation applies by its terms to "*any* injury or loss on account of *any* error,

omission, or other professional negligence." Clerk's Papers (CP) at 26 (emphasis added). The contract expressly limits D.R. Strong's "*liability* to the Client . . . *arising out of the performance of [its] professional services.*" *Id.* (emphasis added). This liability limitation applies to *all* professional services regardless of whether they are set out in the written agreement. Giving effect to the parties' express contractual agreement to limit D.R. Strong's liability resolves the negligence and negligent misrepresentation claims.[1]

While this third basis is not argued it can be determined as a matter of law based on settled principles of contract law and the record, which includes the written contract that was brought to the attention of the trial court. The provision limiting professional liability unambiguously limits liability arising out of D.R. Strong's performance of its professional services.

I strongly disagree with the majority's sua sponte creation of an issue that inflates this litigation without any meaningful consequence to the case. This court could effectively and fairly answer the question whether partial summary judgment should have been granted on the negligence and negligent misrepresentation claims without delaying this case to resolve the unnecessary question posed by the majority.

## Analysis

The majority alone raises the issue of the scope of D.R. Strong's professional services, believing this to be necessary in order to decide whether the Donatellis' negligence and negligent misrepresentation claims can go forward. As noted, this is not

---

[1] As explained below, any oral terms in conflict with the limitation of liability provision cannot be given effect.

an issue raised by the parties; none of the appellate briefing filed by either party in this court or in the Court of Appeals raises or argues the issue the majority now finds dispositive of this review. Generally, we do not reach issues not raised by the parties. *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 348 n.8, 103 P.3d 773 (2004); *State v. Taylor*, 150 Wn.2d 599, 603 n.2, 80 P.3d 605 (2003).

The court does have "'inherent authority to consider issues not raised by the parties if necessary to reach a proper decision.'" *Humphrey Indus., Ltd. v. Clay St. Assocs., LLC*, 176 Wn.2d 662, 671, 295 P.3d 231 (2013) (quoting *Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429, 759 P.2d 427 (1988)). The key is that the authority exists to reach a correct and fitting resolution of the case. But here the majority's consideration of the issue it raises does not lead to a proper decision, and in fact the opposite is true.

First, whether the scope of professional services goes beyond the written contract makes no difference, either to the three grounds I propose that would properly resolve this case *or* to the question of whether the "independent duty doctrine" applies here, the latter being the question the majority says it cannot answer. Second, because there are valid bases on which to fully resolve the negligence and negligent misrepresentation claims, it is needless to extend this litigation. Third, the majority's approach is unfair to the parties.

This case involves a contract for engineering services. The Donatellis do not assert claims for physical harm to persons or property. Rather, their asserted negligence

claims are based on the failure to complete the project as contracted for. This being the case, precedent dictates that their remedies are contractual. In *Berschauer/Phillips*, a general contractor who had been awarded the construction contract for school renovation and construction asserted direct and assigned tort claims against the architect and structural engineer, claiming that the plans were inaccurate and defective and this negligence led to construction delays and cost overruns. The contractor had also been assigned the school district's contract claims against the architect.

This court held that "the economic loss rule does not allow a general contractor to recover purely economic damages from a design professional in tort." 124 Wn.2d at 833. The court recognized that in the design-construction industry contractual arrangements are made based on expected liability exposure. The court explained that its holding ensures that the allocation of risk and determination of potential liability in the future is what the parties bargain for by contract. *Id.* at 826. "A bright line distinction between the remedies offered in contract and tort with respect to economic damages also encourages parties to negotiate toward the risk distribution that is desired or customary. We preserve the incentive to adequately self-protect during the bargaining process." *Id.* at 827.

Here, the subject matter is preparing engineering plans and related services for development of the Donatellis' land into two short plats, similar to the design professionals' obligations in *Berschauer/Phillips*. There is no meaningful difference

5

between the services in the two cases, nor are the tort claims different in any meaningful way. In both cases, the tort claims rest on alleged delay and excess costs.

Further, the parties' contract reflects exactly the kind of risk distribution addressed in *Berschauer/Phillips*, with D.R. Strong expressly contracting to adequately "self-protect" through a contractual limitation of professional liability, in addition to the contractual terms setting out the parties' obligations under the contract. The parties' contract expressly limits liability to the amount of fees paid, while permitting the Donatellis to secure waiver of this limit by paying an additional amount, which they did not do.[2] The parties expressly allocated the risks associated with the subject of their contractual relationship.

The injury or harm involved in *Berschauer/Phillips* and the injury or harm alleged in the present case is of the same kind, i.e., increased construction costs and loss of

---

[2] The contract states:

> LIMITATIONS OF PROFESSIONAL LIABILITY: DRS' [(D.R. Strong's)] findings, recommendations, specifications, or professional opinions will be presented, within the limits prescribed by the Client [(the Donatellis)], after being prepared in accordance with generally accepted professional engineering and surveying practice. DRS makes no other warranty, either expressed or implied. For any injury or loss on account of any error, omission, or other professional negligence, the Client agrees to limit DRS and/or its professional employees' liability to the Client and to all agents, contractors, and subcontractors arising out of the performance of our professional services, such that the total aggregate liability to all those named shall not exceed $2,500, or our fee, whichever is greater. In the event the Client does not wish to limit our professional liability to this sum, we shall waive this limitation upon the Client's written request made at the time of the initial authorization on a given project, provided that the Client agrees to pay for this waiver an additional 5% of our total fee or $500, whichever is greater.

CP at 26.

expectation interests under the contract, the kind of harm or injury for which contract remedies are more appropriate.

In contrast, and as we have recognized, tort law traditionally provides remedies for injuries classified as physical harm. *Stuart v. Coldwell Banker Commercial Grp.*, 109 Wn.2d 406, 420, 745 P.2d 1284 (1987) (citing WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS § 101, at 665 (4th ed. 1971)); *see* RESTATEMENT (THIRD) OF TORTS § 1 (2000) ("Issues And Causes Of Action addressed By This Restatement": "This Restatement . . . applies to all claims (including lawsuits and settlements) for death, personal injury (including emotional distress or consortium), or physical damage to tangible property.").[3] Neither *Berschauer/Phillips* nor the present case involves harm or injury to persons or physical damage to property.

This case is legally indistinguishable from *Berschauer/Phillips*.

The majority maintains, however, that the ultimate issue that has to be resolved is whether the tort claims are permissible under the independent duty doctrine, explaining that the economic loss doctrine analysis used in *Berschauer/Phillips* is no longer the appropriate analysis. The majority reiterates the statement from the lead opinion in *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wn.2d 380, 387, 241 P.3d 1256 (2010), that the term "'economic loss rule' was a misnomer." Majority at 7.

---

[3] *See also* RCW 4.22.070(1), a provision of the 1986 tort reform act, which requires the trier of fact to "determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages," including "the claimant or person suffering *personal injury or incurring property damage*," with an exception not relevant here. (Emphasis added.)

However, in *Affiliated FM Insurance Co. v. LTK Consulting Services*, 170 Wn.2d 442, 450 n.3, 243 P.3d 521 (2010), the lead opinion stated that the decisions in *Eastwood* and *Affiliated FM* "leave intact our prior cases where we have held a tort remedy is not available in a specific set of circumstances." Thus, in *Eastwood* and *Affiliated FM* the court did not purport to change the fundamental underpinnings of our precedent but instead embarked on an effort to clarify prior case law and provide what the court thought to be a clearer approach for deciding when tort claims may be pursued, notwithstanding the fact that the parties' dealings arise from their contractual relationship. *See* majority at 7. *Eastwood* and *Affiliated FM* indicate that if circumstances are the same, the same result should be obtained under the independent duty doctrine as would have been obtained prior to these decisions. We held in *Berschauer/Phillips* that tort remedies are not available in the present circumstances and therefore *Berschauer/Phillips* should control on the issue whether tort duties may be pursued. Thus, this case can be decided on the basis that under *Berschauer/Phillips* the tort claims asserted by the Donatellis cannot be pursued.

As a second method for resolving this case, the court could use it to correct the court's recent analysis for deciding whether a contracting party can pursue tort claims arising out of the parties' contractual relationship. The "independent duty doctrine," unlike the economic loss rule, suffers from a significant defect in that it springs from the wrong analytical starting point. The analysis under this doctrine implicitly begins with the question, why not allow tort remedies?—starting, and ending, with what tort duties

8

might be found. But when the parties' relationship is contractual, the more important questions are whether the dispute or claim is within the scope of the contract and if so why allow any remedies outside the contract? At the same time, the nature of the risk of harm is an integral part of the inquiry, as the court recognized in *Berschauer/Phillips* and in the lead opinion in *Affiliated FM.* Personal injury and physical damage to property are not risks traditionally remedied by contract and indeed the opposite is true.

In these respects, therefore, the economic loss rule, unlike the "independent duty doctrine" as explained by the majority, more appropriately focuses on the parties' contractual relationship and asks what is covered by the contract, and treats personal injury and physical harm as appropriately remedied in tort. These basic concepts have been core principles of the economic loss rule, as the court said in *Alejandre v. Bull*, 159 Wn.2d 674, 683-84, 153 P.3d 864 (2007):

> [T]he purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses. If the economic loss rule applies, the party will be held to contract remedies, regardless of how the plaintiff characterizes the claims. . . . The key inquiry is the nature of the loss and the manner in which it occurs, i.e., are the losses economic losses, with economic losses distinguished from personal injury or injury to other property.

Importantly, as the majority explains in the present case, this distinction in the type of loss is retained under the independent duty analysis when contracts for engineering and other design professional services are involved. The independent duty analysis applies when the design professional's obligation is to avoid causing foreseeable personal injuries or property damage. Majority at 9 (explaining case law).

9

The complaint here alleges a breach of contract cause of action, asserting that D.R. Strong breached the contract by "failing to complete the Project in a timely, competent and cost effective manner." CP at 3. Significantly, the negligence claims are virtually identical. The complaint alleges that D.R. Strong was negligent in failing "to complete the Project in a timely, competent and cost effective manner" by allegedly taking too long on the project, charging more than originally quoted, and redoing work. *Id.* at 4. And the complaint alleges that D.R. Strong negligently misrepresented the amount of time and cost to complete the work, the representations were false when made, and the Donatellis justifiably relied on the misrepresentations. *Id.* at 4-5. Thus, whether couched as a contract breach or a negligence claim, these causes of action all arise out of the contract and the alleged failure to meet contractual obligations. They involve no personal injuries or damage to property.

Ultimately, this case involves a straightforward claim of breach of contract, despite the Donatellis' efforts to show actionable negligence. The remedies for this breach are contractual.

Finally, the court can decide this case by giving effect to the professional liability limitation in the contract. Whether the claims here sound in contract or tort, they fall within this liability provision. A limitation of liability is a permissible allocation of risk of negligent acts or omissions; there is no requirement that it apply to contractually based liability alone. *See, e.g., Am. Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d

217, 230, 797 P.2d 477 (1990) (generally, "a party to a contract can limit liability for damages resulting from negligence").

Moreover, giving effect to a limitation of professional liability provision in a contract for professional design services effectuates the parties' bargained-for allocation of risks:

> Permitting recovery in tort against a design professional solely for commercial loss in the construction context often frustrates the parties' bargained for risk-arrangement and, consequently, their corresponding economic expectations. For example, tort recovery may allow a party to recover damages that were otherwise limited or excluded under the contract. The difference between recovery in tort or contract under these circumstances may amount to millions of dollars. In other words, tort remedies rewrite the contract by reallocating the risk of loss, potentially giving a windfall to the party who prevails under a tort theory for remedies otherwise limited or unavailable under the contract.

Benjamin J. McDonnell, *Finding a Contract in the "Muddle": Tracing the Source of Design Professionals' Liability in the Construction Context Under Washington's Independent Duty Doctrine*, 48 GONZ. L. REV. 627, 664-65 (2012-2013) (footnotes omitted).

When reviewing a decision on a motion for summary judgment, "[a] question of contract interpretation may be determined as a matter of law if it does not turn on the 'credibility of extrinsic evidence or . . . a choice among reasonable inferences to be drawn from extrinsic evidence.'" *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594, 305 P.3d 230 (2013) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990) (quoting RESTATEMENT (SECOND) OF CONTRACT § 212 (1981))).

11

The contract provision states, in a paragraph headed "LIMITATIONS OF PROFESSIONAL LIABILITY," "For *any* injury or loss on account of *any* error, omission, or other professional negligence, the Client agrees to *limit* DRS and/or its professional employees' *liability* to the Client and to all agents, contractors, and subcontractors *arising out of the performance of our professional services*." CP at 26 (emphasis added). When interpreting contracts, words are generally given their ordinary meaning and the parties' mutual intent is effectuated. *City of Tacoma v. City of Bonney Lake*, 173 Wn.2d 584, 590, 269 P.3d 1017 (2012). "'[A]ny'" means "'every'" and "'all.'" *State v. Sutherby*, 165 Wn.2d 870, 881, 204 P.3d 916 (2009); *State v. Westling*, 145 Wn.2d 607, 611, 40 P.3d 669 (2002). The limitation of liability provision is clear in encompassing professional liability arising from negligently performed professional services and should be enforced.

The negligent misrepresentation claim should not be treated any differently than the other negligence claims. Both involve alleged failure to perform the engineering services in a cost-effective and timely manner. In the case of the misrepresentation claim, the alleged negligence concerns an alleged failure to accurately represent the *professional services*, i.e., how long they would take and what they would cost, thus falling within the limitation of professional liability provision.[4]

---

[4] The Donatellis' negligent misrepresentation claim is not a claim that no valid contract was formed. Indeed, they assert a cause of action for breach of contract, which is only possible when an enforceable contract exists. Thus, whether a negligent misrepresentation claim could ever be a possible ground for claiming that no valid contract was formed is not in question that must be considered in the present case. This matter is addressed below.

The next question that must be resolved is whether the written contract provision is enforceable. Although this question requires attention to several legal principles, in the end summary judgment standards, settled contract law principles, and evidence in writing in the record dictate that the liability limitation is enforceable notwithstanding the possible existence of oral terms for additional services not set out in the parties' written contract or assumption of professional services not set out in the written contract.

On review of a denial summary judgment the court engages de novo in the same inquiry as the trial court. *Kofmehl*, 177 Wn.2d at 594. All of the facts and inferences therefrom are construed in favor of the nonmoving party. *Id.* Summary judgment is improper if there is a genuine issue as to a material fact, shown by pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. CR 56(c).

In general, when reviewing a decision on a motion for summary judgment, an appellate court is to consider only the evidence and issues called to the attention of the trial court. RAP 9.12. A reviewing court can decide whether a motion for summary judgment should be granted on an issue not decided by the trial court if the issue is supported by the record and is within the pleadings and proof. *Plein v. Lackey*, 149 Wn.2d 214, 222, 67 P.3d 1061 (2003). The questions whether the Donatellis' tort claims may be asserted or whether only contract remedies may be pursued were before the trial court. D.R. Strong submitted the written contract for the trial court's consideration when deciding the motion for partial summary judgment, and it was thus called to the attention of the trial court. This brings the contract within the scope of materials that may be

considered on review. *See, e.g., Mithoug v. Apollo Radio of Spokane*, 128 Wn.2d 460, 909 P.2d 291 (1996); *cf.* CR 56(c) (referring to "the pleadings, depositions, answers to interrogatories, and admissions *on file*, together with the affidavits, if any" (emphasis added)).

As explained, on appellate review the Donatellis plainly have not argued the issue that is decided by the majority relating to possible oral terms of the parties' contract. They do, however, allege in their amended complaint that an oral agreement was entered into in "October of 2002." CP at 2. Since they do not refer to a written agreement in the amended complaint, the implication from the complaint alone is that the parties' contract is oral. As indicated, however, D.R. Strong submitted the parties' written agreement and an accompanying cover letter, together appended as exhibit 1 to a declaration that the order on the motion for partial summary judgment identifies as having been considered by the trial court. The cover letter is dated October 11, 2002, and identifies itself as concerning the "Proposal For Engineering Services [for] Two-Short Plats [of] Lots 2 & 3, Blk. 5, Jordan's Acre Gardens Addition." *Id.* at 20. In this letter, D.R. Strong informed Mr. Donatelli that it was pleased to provide "this revised proposal for engineering services for the" short plat project, telling him that if he "wish[ed] to proceed with this project work," he should "sign and return" the proposal to D.R. Strong "as confirmation that [he has] read these terms and as [D.R. Strong's] authorization to proceed." *Id.*

The written contract is titled, in large font on four lines centered near the top of the page, with considerable blank space on either side, a "REVISED PROPOSAL FOR

14

ENGINEERING SERVICES." *Id.* at 21. Mr. Donatelli both signed this written contract and dated it "10/31/02" below D.R. Strong's president's signature of October 11, 2002. *Id.* at 25.

In other words, Mr. Donatelli signed the written contract on the very last day of the very same month in which the amended complaint asserts an oral agreement was entered into.

Moreover, when Mr. Donatelli was asked if he had a written agreement with D.R. Strong for services, he testified, "I believe so, yeah." *Id.* at 10 (Donatelli dep. at 24). When shown a copy of the contract he also testified that as far as he knew, which he explained to mean as far as he could remember, it was the agreement he had with D.R. Strong. He agreed he had signed the written agreement and dated it October 31, 2002, and testified that he negotiated the scope of the services in the contract. After he explained that he wanted D.R. Strong to perform services to obtain a recorded short plat, he was asked if the written contract described all of the paperwork he wanted D.R. Strong to prepare. He testified that "if there was [sic] any other things needed for the short plat to be recorded then . . . they would add additional services to achieve [his] goal." *Id.* at 11 (Donatelli dep. at 28-29).

The written agreement contemplates the possibility of such additional services to those in the contract. Under the heading "PROPOSAL WORK," the contract states that

> [c]orrections or revisions that come as a result of the County's or the Client's inclusion of new concepts, requirements, unpublished policies and procedures, or previously undiscovered issues are not included in this scope

15

of work. If these types of corrections or revisions are requested, they will
be addressed as Additional Services as described below.

*Id.* at 21. The provision in the contract about additional services states that "[i]ssues may arise during the project review by the various agencies which may not have been included in the above scope of work, and in such case would require the Client's additional authorization in order to proceed." *Id.* at 23.

From the record, the only reasonable conclusion that can be drawn is that if there was an oral agreement for additional services, it was either subsumed by the written contract, it modified the written agreement, or it would be additional to the written contract as Donatelli's deposition testimony and the written contract contemplated might occur. Absolutely nothing in the record suggests that any oral contract *replaced* the written contract.

On summary judgment, "when reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985); *accord P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 207, 289 P.3d 638 (2012). Considering all the evidence submitted, there is no genuine issue of material fact on the question of whether the parties had a written contract. *See, e.g., White v. State*, 131 Wn.2d 1, 17, 929 P.2d 396 (1997) (the appellate court can examine the record and determine on its de novo review that evidence submitted does not create a genuine issue of material fact).[5] Reasonable minds cannot differ that the written terms

---

[5] The majority mistakenly says that D.R. Strong "seems to argue that it only agreed to provide the six phases of engineering services outlined in the written contract." Majority at 10. This is

16

are at the least part of the parties' agreement, even if not the entire agreement. Indeed, the majority does not suggest that the parties entered only into an oral agreement.

Mr. Donatelli now maintains, however, that he signed the contract without knowing what he signed and says that the written contract does not reflect the parties' agreement. He also claims he paid far more than the fee stated in the written contract.[6]

The record shows that Mr. Donatelli is nonetheless bound by the contract he signed. First, individuals voluntarily signing a written contract without reading it are deemed to have manifested assent to its terms. "One cannot, in the absence of fraud, deceit or coercion be heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose contents he was in law bound to understand." *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 381, 745 P.2d 37 (1987) (quoting *Nat'l Bank of*

---

clearly not the case. First, as discussed in this opinion, the possibility of additional services was expressly addressed in the contract and according to Donatelli's testimony, was discussed during negotiations. Additional services are, in fact, listed in the contract as the seventh phase ("Phase 700", CP at 23). In addition, the written contract was entered after the county issued a preliminary short plat approval letter on October 4, 2002. From evidence in the record of communications between the county and D.R. Strong, it is apparent that D.R. Strong provided professional services in obtaining this preliminary plat approval.

The present dispute concerns the final engineering plans, sewer and water main extension designs, construction phase services and final plat map necessary to short plat the two parcels—matters covered by the written contract. *See Id.* at 20. It may concern additional services assumed, agreed upon orally and allowed for by the written contract. The dispute does not concern whatever services were rendered in obtaining preliminary approval. Thus, the source of any obligation for such services is an irrelevant question on this discretionary review.

[6] The written contract shows that D.R. Strong's services were not promised for a flat fee. The first two phases, concerning final engineering plans and the sanitary sewer and water main extension, are for stated flat amounts, but the next four phases are for "Time & Material" and two of these expressly add that the amounts listed are estimates ("Est."). *Id.* at 23. The contract contains a schedule of charges that lists hourly rates for various persons providing services, for example, a principal engineer's services are listed at "$130/Hour." *Id.* at 26. In short, the written contract contemplates both the possibility that D.R. Strong's fees might be higher than estimates provided.

17

*Wash. v. Equity Investors*, 81 Wn.2d 886, 913, 506 P.2d 20 (1973)). "The whole panoply of contract law rests on the principle that one is bound by the contract which he voluntarily and knowingly signs." *Nat'l Bank*, 81 Wn.2d at 912-13.

Under the circumstances here, Mr. Donatelli must be deemed to have assented to the contract that he signed. Although the Donatellis contend that D.R. Strong negligently misrepresented the costs and time of their services and they entered into a contract with D.R. Strong in reliance on these misrepresentations, negligent misrepresentation does not require an intentional act or omission, unlike the defenses to contract formation mentioned in *Skagit Bank* and *National Bank* (fraud, deceit, and coercion). *See generally* 26 WILLISTON ON CONTRACTS § 69:4 (4th ed.) (database updated May 2013) (fraud as rendering a transaction void or voidable); *id.* § 69:11 (fraud with regard to future promises or actions).

More importantly, the Donatellis do not claim that there is no enforceable contract because of negligent misrepresentation—in fact, they clearly maintain that an enforceable contract does exist. In their amended complaint they seek at least $1.5 million for breach of contract and they do not seek any remedies of the kind that would follow if the contract were to be found unenforceable.

Thus, this case falls within the rule of *Skagit State Bank* and similar cases. Nothing in the record suggests that Mr. Donatelli lacked the ability to read and understand the written contract or that his signature was involuntary. Thus, Mr.

Donatelli's signature on the written contract on October 31, 2002, shows assent to the terms of the written contract regardless of his present assertions.

Because reasonable minds cannot differ from the evidence in the record that the written contract is at the least part of the parties' agreement and that its terms are binding, the next question is whether any possible oral terms could modify the written contract, and more specifically and importantly, whether an oral term could exist that would alter the professional liability limitation in the write contract.

Initially, the majority leaves the incorrect impression that the only relevant bar to oral contract terms would be a merger or integration clause in the written contract, which the majority does not find. Majority at 10 n.2. But whether a contract is fully integrated or not does not depend on whether there is a written merger or integration clause in the contract. A written contract can be fully integrated without a merger or integration clause—the lack of such a clause in the parties' written agreement has little if any significance.[7]

Thus, *if* it were necessary to decide whether the written contract is integrated, additional extrinsic evidence would be admissible to determine if the contract is fully integrated. But it is *unnecessary* to decide whether the contract is fully integrated. This

---

[7] To make the "preliminary determination whether the parties intended the written document to be an integration of their agreement, which is a question of fact, the trial court must hear all relevant, extrinsic evidence, oral or written." *Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986); *see also M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

is because in either case the parol evidence rule precludes giving effect to any oral term that would be inconsistent with or would change the professional liability limitation.

Although extrinsic evidence can always be submitted when interpretation of existing terms is at issue,[8] different rules apply when the question is admissibility of extrinsic evidence to add to or modify terms of a written contract. Under the parol evidence rule, if the written contract is fully integrated, i.e., is a final and complete expression of the parties' agreement, parol (extrinsic) evidence is *not* admissible to add to, subtract from, or alter the terms of the contract—period. *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 32, 959 P.2d 1104 (1998). If, on the other hand, the written contract is not fully integrated but instead is partially integrated, parol evidence can be admitted to prove additional terms not included in the writing subject to the rule that such evidence *is not* admissible to prove additional terms that are *inconsistent with or would change* the written terms. *Id.* at 32-33 ("[w]here a partially integrated contract is involved, parol evidence may be used to prove the terms not included in the writing, provided, of course, that the additional terms are not inconsistent with the written terms" (footnote omitted) (citing *Emrich*, 105 Wn.2d at 556)).

---

[8] *See Berg v. Hudesman,* 115 Wn.2d 657, 669, 801 P.2d 222 (1990) (quoting *J.W. Seavey Hop Corp. of Portland v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944)); *see also, e.g., U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 570, 919 P.2d 594 (1996). However, "use of parol, or extrinsic, evidence as an aid to interpretation does not convert a written contract into a partly oral, partly written contract." *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 32, 959 P.2d 1104 (1998).

Thus, regardless of whether the written contract here is fully or partially integrated, extrinsic evidence of any oral terms is not admissible to prove terms inconsistent with the written contract or that would change the written terms.

The parties' written contract contains the explicit limitation of professional liability, as explained. Evidence of oral terms is inadmissible to prove any contract term that conflicts with the professional liability limitation in the written contract, regardless of whether the written contract is fully integrated. Accordingly, the professional liability provision applies and prevents the Donatellis from going forward on their negligence and negligent misrepresentation claims.[9]

As explained, the court could decide the summary judgment question on any, or all, of the three grounds I have discussed above. The three bases I propose, separately or together, resolve this case and dictate that summary judgment should have been granted in D.R. Strong's favor. Moreover, resolving the issue of whether the negligence and negligent misrepresentation claims can go forward will avoid unnecessary expense and time for the parties, counsel, and the judicial system.

But if the court is not inclined to use any of these grounds to resolve this discretionary review, it still should not require the parties to engage in a meaningless factual inquiry on remand. Even under the majority's analysis for when the "independent duty doctrine" applies, it makes no difference in this case whether the professional

---

[9] Although the professional liability provision states that the Donatellis could waive the liability limitation if they paid the greater of 5 percent of the professional fee or $500—a nominal amount—they did not do so.

21

services arose solely under the written contract or whether services were added by oral agreement or D.R. Strong's conduct. As noted, the majority explains that engineering services can in some instances give rise to a tort duty independent of the contract because design professionals, including civil engineers, have an independent duty to use reasonable care with respect to personal injuries and physical damage to property. Majority at 9.

Here, however, the negligence claims concern the Donatellis' inability to develop their property and sell residential lots on the short platted property as they planned to do, allegedly because costs and delay in D.R. Strong's professional services resulted in failure to develop the property before the 2007 economic collapse. These claims asserting costs and delay do not involve personal injuries or property damage. Thus, *whatever* the source of D.R. Strong's professional obligations, whether under the written contract, additional oral terms, or by assumption, the alleged failure to carry out them out does not implicate the independent duty doctrine. The factual inquiry the majority demands does not concern an issue of *material fact*. Summary judgment is not precluded because of the factual question the majority identifies. CR 56(c).

The trial court, however, is likely to reasonably conclude that remand for this factual determination would not have been directed unless it matters. If on remand additional services are established, how is the trial court to proceed when this court's cases indicate that the independent duty doctrine does not apply to professional services unless personal injury or property damage is asserted?

22

There is no reason to add to this litigation by remanding for a factual determination of the scope of possible additional services orally contracted for or assumed by D.R. Strong. The majority's decision is an unfair resolution of this case. As noted, neither party addresses the issue the majority finds compelling, either in briefing at the Court of Appeals or this court. The court lacks argument or authority that D.R. Strong itself might have submitted had it known this was going to be an issue. As demonstrated by this dissent, D.R. Strong would have had a number of compelling arguments available to show that summary judgment is appropriate on the negligence and negligent misrepresentation claims, notwithstanding the question whether some professional services were agreed to or assumed.

Litigation is time consuming and costly, and this is certainly true when professional design and construction contract matters are at issue. It is not fair to extend this litigation on a basis so fraught with pitfalls when there are other grounds to resolve the propriety of the trial court's order denying summary judgment. The negligence and negligent misrepresentation claims should have been dismissed as a matter of law, for any or all of the following reasons: under existing precedent, in particular, *Berschauer/Phillips*, the tort claims should not go forward because they do not involve personal injury or damage to property; the claims asserted arise from the contract and contract remedies alone are implicated and appropriate—no personal injury or property damage is alleged; and the professional liability limitation in the written contract bars the negligence claims under settled contract principles that show the provision is enforceable

23

and applies to the negligence and negligent misrepresentation claims. Finally, even under the independent duty approach, no independent tort duties are implicated and proof of additional professional services would not alter this conclusion.

## Conclusion

This case is legally indistinguishable from *Berschauer/Phillips* and, as in that case, the Donatellis' tort claims here should not be allowed against the design professional engineering firm, defendant D.R. Strong. All of the claims asserted by the Donatellis arise out of the contract, and no personal injuries or physical damage to property is asserted.

The majority's extended discussion of the "independent duty doctrine" is unnecessary. It fails to preserve the distinction between contract and tort when the subject matter and nature of the plaintiffs' claims and the alleged injuries or harm fall within their contractual relationship.

The limitation of liability provision in the contract should be enforced. It covers both the negligent misrepresentation claim and the professional negligence claim, as both concern the professional duties under the written contract.

I would hold that the trial court erred when it denied D.R. Strong's motion for summary judgment on the negligence claims. The negligence claims are not permissible under our precedent, and they are not allowable under the limitation of professional liability provision in the parties' contract.

24

Madsen, C.J.

Wiggins, J.